IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EARL PONDEXTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| | ) |
| THE ALLEGHENY COUNTY HOUSING | ) |
| AUTHORITY, | ) |
| | ) |
| Defendant. | ) |

C.A. 2:04CV536

## MEMORANDUM OPINION

Fischer, District Judge.

On March 13, 2006, Earl Pondexter (hereinafter "Plaintiff" or "Pondexter"), acting *pro se*, filed an Amended Complaint against the remaining Defendant in this action, the Allegheny County Housing Authority (hereinafter "Defendant" or "Housing Authority"), alleging race and disability discrimination in connection with his eviction from his residence (Docket No. 49). On April 20, 2007, the Plaintiff filed a "Motion for Summary Judgment, Motion for Judgment as a Matter of Law and Motion for Judgment on Partial Pleadings" (Docket No. 71).[1] On May 8, 2007, the Housing Authority filed a Motion for Summary Judgment (Docket No. 76). For the following reasons, the Housing Authority is entitled to summary judgment. An appropriate order follows.

## I.    FACTUAL BACKGROUND

Pondexter, an adult individual, applied for and was issued a Section 8 Tenant-Based Rental Voucher[2] (hereinafter "Voucher") on August 19, 1999. (Docket No. 96, Ex.

---

[1]    Plaintiff filed all of these motions as a single document. For purposes of ruling on these motions, the Court considers this filing a Rule 56 motion.

[2]    Under the Section 8 Tenant-Based Assistance Rental Voucher Program a family is issued a Voucher when it is determined to be eligible to participate in the program. The family chooses a unit, which must be approved by the Housing Authority. Once the

10).   Pondexter signed an acknowledgment stating that he had read the "Family Obligations (Responsibilities) and Grounds for Denial or Termination of Assistance" (hereinafter "Family Obligations") pursuant to his participation in the Voucher program, on August 21, 1999.   (Docket No. 76, Ex. 3).   These obligations provide that the family:

> Must comply with the lease- to pay your rent, as due each month . . . for the terms agreed upon in the lease.   The family may not commit any serious or repeated violation of the lease, including the non-payment of utilities . . . **failure to comply could result in eviction by your Landlord and termination from the Program.**

*Id.* (emphasis added).

Pondexter signed the Voucher on May 3, 2000.   (Docket No. 96, Ex. 10).   The Voucher (voucher number "v 2-037-009") provided that Pondexter was qualified for assistance payments for a two bedroom unit.   *Id.*   It provided that the housing assistance agency, in this case the Housing Authority, would provide housing assistance payments for approved housing on behalf of Pondexter, providing generally that these payments would be the total amount of the monthly cost of rental less thirty percent of Pondexter's income.   *Id.* at ¶ 1, B.   Similar to the Family Obligations, the Voucher itself provides:

> The family (including each family member) must not: . . Commit any serious or repeated violation of the lease.

*Id.,* at ¶ D, 2.   Once the Voucher was issued to Pondexter, pursuant to the terms of the Voucher, he was obligated to select a housing unit and to submit that choice to the Housing Authority for approval.   (Docket No. 96, Ex. 10, at ¶ 1, A).

Pursuant to the Housing Authority's approval (Docket No. 96, Ex. 11), Pondexter entered into a residential lease agreement with an apartment owner, H.P. Knolls

---

unit is approved by the Housing Authority, the Housing Authority enters into a Housing Assistance Payment contract with the owner of the unit to make monthly rent payments to the owner on the family's behalf.   (Docket No. 96, Ex. 10, at ¶ 1).

2

(hereinafter "Green Meadows"), for the lease of a housing unit located at 5413 Youngridge Drive, #25, Baldwin, PA on April 27, 2000, to commence on May 1, 2000. (Docket No. 49, Ex. A). The lease provided that the gross monthly rent for the unit was $561.00 and that Pondexter's monthly contribution was $138.00. *Id.*

On May 1, 2000, concurrent with the lease agreement between Green Meadows and Pondexter, and pursuant to the terms of the Voucher issued to Pondexter, Green Meadows entered into a Housing Assistance Payment Contract (hereinafter "HAP Contract") with the Housing Authority. (Docket No. 96, Ex. 11). The HAP Contract was used to document the agreement between Pondexter and the Housing Authority that, pursuant to Pondexter's Voucher, the Housing Authority approved the housing unit and would provide housing assistance payments on behalf of Pondexter to Green Meadows. *Id.* The HAP Contract lists Pondexter as the tenant, as well as Tarris Pondexter, his son, as a member of Pondexter's household. *Id.* Under the terms of the HAP Contract, the Housing Authority agreed:

> The HAP Contract commences on the first day of the initial lease term. At the beginning of the HAP Contract term, the amount of the housing assistance payment by [Housing Authority] to [Green Meadows] is $328.00 per month.

(Docket No. 96, Ex. 11).

Under the terms of the HAP Contract, the Voucher and HAP Contract were to run concurrently. (Docket No. 96, Ex. 11). The Voucher provides: "The family becomes a participant in the [Housing Authority's] Section 8 Program when the HAP Contract between the [Housing Authority] and the owner takes effect." (Docket No. 96, Ex. 10, at ¶ 2(b)). Furthermore, the HAP Contract provides:

> **Relation to the lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

(Docket No. 96, Ex. 11, at ¶ 4(a)) (emphasis in original). The Housing Authority is not permitted to make assistance payments until the HAP Contract has been executed. *See* 24 CFR § 982.305(c)(2). At the termination of the HAP Contract, Pondexter was no longer eligible for the Voucher, unless he submitted another request for approved housing. Therefore, once there was no HAP Contract for the rental of the unit provided for in the contract, Pondexter was obligated to resubmit a request for suitable housing to the Housing Authority in order to be eligible to receive further assistance. (Docket No. 96, Ex. 10). Furthermore, the Voucher provides that, once the Housing Authority entered into the HAP Contract (in particular the responsibilities of the family listed under the Tenancy Addendum), Pondexter was required to comply with the terms of the Voucher and HAP Contract in order to remain eligible for the Voucher. *Id.* at ¶ 4, A.

Under the terms of the HAP Contract, the Housing Authority agreed to pay $382.00 of Pondexter's rent amount each month. (Docket No. 96, Ex. 11). The HAP Contract further provided that Pondexter would be responsible for the difference between the monthly rent and the contribution by the Housing Authority ($138.00). These amounts are also reflected in the lease. (Docket No. 49, Ex. A). Furthermore, the terms of the HAP Contract state:

> The family is responsible for paying the owner any portion of the rent to owner that is not covered by the [Housing Authority] assistance payments.

(Docket No. 96., Ex. 11). In addition, Pondexter was to be responsible for payment of utilities. (Docket No. 49, Ex. A).

The lease also stipulated that Green Meadows was permitted to increase rent during the term of the lease "upon an increase in the area median family income as established" by HUD. *Id.,* at ¶ 2, B. Pondexter and Green Meadows extended

4

Pondexter's lease of the Youngridge Drive unit on May 1, 2001, to expire on April 30, 2002. (Docket No. 49, Ex. B). The renewal lease agreement, **signed by Pondexter**, provided that he would be responsible for $144.00 per month in rent as well as the payment of electric bills. (Docket No. 49, Ex. 3). It also provided that the HAP payments would be $376.00 per month on Pondexter's behalf. *Id.*

On February 15, 2002, Green Meadows filed a complaint in the Court of Common Pleas of Allegheny County (Docket No. 50, Ex. A), alleging that Pondexter failed to pay the required monthly rent, as provided for in the lease[3], for the months of December 2001 and January 2002. (Docket No. 50, Ex. A, at ¶ 10). In the complaint, Green Meadows alleged that Pondexter owed a total of $398.00 in back rent. *Id.* Furthermore, Green Meadows contended that it provided Pondexter with notice that he would be required to pay the amount due, or the lease agreement would be terminated and Pondexter would be evicted from the apartment at Youngridge Drive. (Docket No. 50, Ex. B., at ¶ 11). In the complaint, Green Meadows sought, *inter alia*, possession of the premises and unpaid rent. *Id.*

On January 30 , 2002, District Justice John Bova entered a judgment against Pondexter and awarded Green Meadows back rent and possession. (Docket No. 50, Ex. C). Pondexter subsequently requested a *de novo* review of the district justice's decision in the Court of Common Pleas of Allegheny County. (Docket No. 50, Ex. D). Green Meadows again filed a complaint seeking back rent and possession, to which Pondexter

---

3     According to the lease, Pondexter rented his housing unit, #25, as well as a garage. (Docket No. 50, Ex.A).

responded with counterclaims[4], alleging that Green Meadows wrongfully evicted him for

withholding his rent. (Docket No. 50, Ex. D). Pondexter argued that he was withholding

his rent because he was unhappy with the living conditions at Green Meadows complex

citing, *inter alia*, problems with loud noise and that Green Meadows wrongfully evicted

him and failed to address his concerns. (Docket No. 100, Ex. 13). In an action before the

Pennsylvania Human Relations Commission (PHRC), Pondexter further alleged that,

under the Pennsylvania Human Relations Act[5], Green Meadows discriminated against

him based upon his race and disability[6] in evicting him and failing to provide him with

adequate housing. (Docket No. 100, Ex. 13, at 3, 4). Additionally, in his Answer to

Green Meadows complaint, Pondexter alleged, in pertinent part, that Green Meadows

evicted him essentially in breach of the contract between Pondexter and Green Meadows

in violation of his rights as a participant in the Section 8 Voucher Program. (Docket No.

100, Ex. 13, at 4). On March 31, 2002, an arbitration panel entered judgment in favor of

Green Meadows and Pondexter again appealed, seeking a non-jury trial. On September

12, 2003, after the conclusion of a non-jury trial, the Honorable Max Baer[7] entered a

verdict for Green Meadows. Specifically, that Court found:

---

4      Pondexter brought a counter Complaint against Green Meadows and Answer to
Green Meadows Complaint in the Court of Common Pleas of Allegheny County. (*See*
Docket No. 100, Exs. 12, 13).

5      The Court notes that, while the records of the proceedings before the PHRC have
not been made part of the record in the instant case, Pondexter does refer to this action in
a deposition taken at Civil Action No. 01- 2161, stating that after a "fact finding
conference" the [P]HRC found in favor of the Housing Authority as to these claims.
(Docket No. 122-3, Ex. E, at 85-88, filed at Civil Action No. 01-2161).

6      Pondexter is an African American individual and has documented mental health
issues. (*See* Docket No. 90).

7      At the time of the September 12, 2003 non-jury trial, Justice Baer was sitting on
the Court of Common Pleas. He currently sits as a Justice on the Supreme Court of the
Commonwealth of Pennsylvania.

(1)    [Green Meadows] is granted permanent possession of [apartment] 5413 Youngridge [Drive], Green Meadows Apts.

(2)    [Green Meadows] is awarded all monies paid into escrow with the Prothonotary by [Pondexter] in relation to this case, also any interest accrued thereon.

(3)    [Green Meadow's] claim for counsel fees is DENIED.

(4)    Verdict for [Green Meadows] and against [Pondexter] on all counterclaims sought by [Pondexter].

(Docket No. 50, Ex. E). Judgment was then entered against Pondexter by Order dated October 21, 2003. (Docket No. 76, Ex. 1). Pondexter did not appeal the decision of the Court of Common Pleas. (Docket No. 76, Ex. 1).

During the pendency of the state court litigation, the Housing Authority continued to make housing assistance payments to Green Meadows on Pondexter's behalf. (Docket No. 96, Ex. 12). The final assistance payment was made on April 1, 2002. (Docket No. 96, Ex. 13). Pondexter was evicted from the Youngridge Drive premises on April 22, 2002, based on the April 10, 2001 Order of the District Justice. (Docket No. 96, Ex. 14). Pondexter's lease was set to expire on April 30, 2002. (Docket No. 96, Ex. 19). Based on the evidence provided by the parties, there is nothing of record before this Court to suggest that Pondexter either renewed his lease or submitted an application for further housing assistance.

The Housing Authority contends that the termination of Pondexter's Section 8 Voucher was pursuant to the terms of the Voucher and the HAP Contract. (Docket No. 77, at 2). Specifically, the Housing Authority contends that Pondexter acknowledged that failure to comply with his lease, including failure to pay rent, could result in eviction and, therefore, termination of the Voucher. *Id.,* at 3. The Housing Authority further alleges that, once Pondexter's lease was terminated, Pondexter's voucher was

7

automatically terminated under the terms of the HAP Contract.[8]  *Id.*  In this case, the

Housing Authority argues that, regardless of the outcome of the litigation in state court at

the time, Pondexter's lease with Green Meadows terminated, and because Pondexter

failed to submit an application for alternative housing, the HAP Contract, and

subsequently the Voucher, terminated as well. (Docket No. 96, at 9, 10).

## II.    PROCEDURAL HISTORY

Pondexter filed the present Complaint in this District Court in his own right and

on behalf of his son, Tarris Pondexter[9], on April 14, 2004 against the Housing Authority,

Green Meadows and HUD. (Docket No. 2).  By Memorandum Order dated August 19,

2004, Judge Conti dismissed Pondexter's Complaint as it pertained to Green Meadows,

pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Docket No. 10).  By

Order dated March 9, 2006, Judge Hardiman dismissed Pondexter's Complaint as it

---

8      While the Housing Authority has not provided direct evidence that Pondexter
failed to resubmit an application for housing assistance at the termination of his lease,
this Court, pursuant to Rule 201(b)(2) of the Federal Rules of Evidence, takes judicial
notice of such evidence provided in the form of exhibits in support of the Housing
Authority's Response to Motion for Injunctive Relief filed by Pondexter at Civil Action
No. 01-2161.  Specifically, this Court takes notice of the following documents provided
by the Housing Authority (also a defendant in that case) in support of said response at
Civil Action No. 01-2161 (Docket No. 62, Exs. 1, 2): (1) a letter dated January 28, 2002
from Mary Ann Nau advising Pondexter that his "Annual Recertification" was to be
effective May 2002.  The letter further states "Failure to keep this appointment or to
reschedule WILL result in termination of your Section 8 subsidy"; and (2) a notification
to Pondexter from the Housing Authority advising him that his Section 8 Voucher was
due to terminate on May 1, 2002, at the end of Pondexter's lease, signed by Mary Ann
Nau, Housing Counselor.  The notification further notes that Plaintiff was a "no show for
recertification or makeup [appointment]."

Furthermore, Pondexter has offered no evidence (neither in this case nor in the
now determined case before Judge Cercone) that refutes the information in the above
document, nor does he provide any explanation for his failure to resubmit an application
for housing, or for his failure to appear for his recertification appointment.

9      Plaintiff Tarris Pondexter was terminated as a party to this action on March 9,
2006. (Docket Nos. 47 and 24).

pertained to HUD and Pondexter was ordered to file an amended complaint against the Housing Authority. (Docket No. 47). Pondexter then filed an amended complaint against the Housing Authority on March 13, 2006. (Docket No. 49). The Housing Authority filed its Answer to Amended Complaint and Affirmative Defenses (Docket No. 60) on October 9, 2006.

Pondexter proceeded to file a Motion for Summary Judgment, Motion for Judgment as a Matter of Law and Motion for Judgment on his Partial Pleadings (Docket No. 71) on April 20, 2007. Pondexter also filed his Pre-Trial Statement (Docket No. 74) on May 7, 2007. In turn, the Housing Authority filed a Response to Plaintiff's Motion for Summary Judgment (Docket No. 75), a Motion for Summary Judgment (Docket No. 76), and Brief in Support (Docket No. 77) on May 8, 2007. Pursuant to this Court's Order of May 29, 2007 (Docket No. 80) and pursuant to Local Rule 56.1, as well as this Court's policies and practices, the Housing Authority filed a Statement of Facts in support of its Motion for Summary Judgment (Docket No. 82) on June 5, 2007. It also filed a Pre-Trial Statement (Docket No. 83) on June 5, 2007. Pondexter filed an "Introduction of Undisputed Facts" (Docket No. 84) on June 8, 2007 and "Statement of Undisputed Facts" on June 15, 2007. (Docket No. 85). Pondexter filed, as evidence in support of his claims, certain Medical Documentation. (Docket No. 90). Pondexter has further filed, in support of his claims, a statement of "Newly Undiscovered Evidence." (Docket No. 93).

By Order dated August 30, 2007, this Court sought a more particular statement of facts from both parties pertaining to the dates of Pondexter's eviction and the termination of the Voucher. (Docket No. 94). Pursuant to said Order, Pondexter filed a "Statement of Particular Facts" on September 11, 2007 (Docket No. 95) and the Housing Authority

filed a "Statement of Facts" in response to this Court's Order on September 14, 2007. (Docket No. 96). By further Order, dated September 21, 2007, this Court sought any and all state court documents related to the underlying state court eviction. Defendant filed said documents on September 27, 2007. (Docket No. 100).

## III.   PLAINTIFF'S AMENDED COMPLAINT

Pondexter filed his Amended Complaint against the remaining Defendant, the Housing Authority on March 13, 2006 (Docket No. 49).  In his Amended Complaint, Pondexter asserts several violations of his civil rights.  Specifically, he alleges racial discrimination by the Housing Authority in violation of 42 U.S.C.§§ 1981, 1983, and 1985. Pondexter further alleges discrimination in the administration of a federally funded program in violation of 42 U.S.C. § 2000d[10] and discriminatory housing practices in violation of the Fair Housing Act, 42 U.S.C. §3613.[11]  Generally, Pondexter's Amended Complaint alleges that the Housing Authority discriminated against him based upon his African American race and his disability, namely mental health disorders.  (Docket No. 49, at 8). Pondexter claims that the Housing Authority violated his civil rights by failing to properly administer the HAP Contract, and more specifically through terminating the Section 8 Voucher under the pretext of a lawful eviction.  (Docket No. 49, at 9). Pondexter further alleges that the Housing Authority conspired with Green Meadows to

---

10   42 U.S.C. §2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

11   Section 3613 of the Fair Housing Act, 42 U.S.C. §3601, *et. seq.*,  provides for a private cause of action, under said Act, which, in turn, makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604.

illegally evict Pondexter and based on this unlawful eviction wrongfully terminated his Section 8 Voucher. *Id.*

## IV.   STANDARD OF REVIEW

Both parties have filed motions for summary judgment. Pursuant to Fed. Rule Civ. Proc. 56, summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, ". . . the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (party can move for summary judgment by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."). The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth ". . . specific facts showing that there is a genuine issue for trial . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The inquiry, then, involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218 (1991)

(quoting *Anderson*, 477 U.S. at 251-52). If a court concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. The Court further notes that it must employ less stringent standards in considering Plaintiff's *pro se* pleadings than when considering the work product of an attorney. *Haines v. Kerner*, 404 U.S. 519 (1972).

## V.    DEFENDANT'S MOTION

### A. The Rooker-Feldman Doctrine

Defendant first argues that this court lacks subject matter jurisdiction under the "Rooker-Feldman Doctrine." The Rooker-Feldman doctrine is a judicially-created doctrine that absolutely bar s lower federal courts from reviewing certain state court actions. The doctrine is predicated on the principles of comity and federalism and originated from two Supreme Court opinions, *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). Specifically, the Rooker-Feldman doctrine holds that a United States District Court has no subject matter jurisdiction to review final judgments of a state court because only the Supreme Court has jurisdiction to review state judgments under 28 U.S.C. § 1257. *Feldman*, 460 U.S. at 482; *Rooker*, 263 U.S. at 416. *See also Gulla v. North Strabane Township*, 146 F.3d 168, 171 (3d Cir. 1998); *E.B. v. Verniero*, 119 F.3d 1077, 1091 (3d Cir. 1997), *cert. denied*, 118 S. Ct. 1039 (1998). The Rooker-Feldman doctrine precludes a federal action if the relief requested in the federal action effectively would reverse the state decision or void its ruling. *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996). Moreover, the Rooker-Feldman doctrine applies to the decisions of lower state courts. *In re General Motors Corp. Pick Up Truck Fuel Tank Prod's Liability Litigation*, 134 F.3d 133, 143 (3d Cir. 1998).

In the case at bar, it is not clear that Rooker-Feldman applies. In his state court action in the Court of Common Pleas of Allegheny, Plaintiff did not raise his federal civil rights claims; instead, his claims sounded in contract. (Docket No. 100, Ex. 14). Moreover, it is not at all clear that a ruling in his favor as to his civil rights claims would void the state's decision regarding whether his eviction was proper under the Section 8 voucher program. In a similar action, the Third Circuit held that a tenant's action against his landlord alleging discriminatory practices under the Fair Housing Act was not barred by the Rooker-Feldman doctrine because he had not raised those claims in his state court eviction action. *See Turner v. Crawford Square Apartments III, L.P.,* 449 F.3d 542 (3d Cir. 2006).[12]

To the extent that this Court does have jurisdiction over Plaintiff's amended claims, the following discussion reveals that Defendants are entitled to summary judgment because Plaintiff has not met his burden of showing any violations of his federal civil rights.

---

12    Defendant also argued that Plaintiff's claims were barred by the doctrines of collateral estoppel and res judicata (also known as claim preclusion and issue preclusion) due to Plaintiff's prior lawsuit in this Court at Civil Action No. 01-2161. However, that action claimed discrimination for failure to make a reasonable accommodation based on the particular housing unit Plaintiff was approved for; it did not involve the issues in this action, namely, Plaintiff's "unlawful" eviction, which occurred after Civil Action No. 01-2161 was filed. Moreover, Plaintiff filed an Amended Complaint after the other parties were dismissed in this action alleging racial discrimination and retaliation in violation of his federal civil rights. While the *Rooker-Feldman* doctrine may have been applicable to Plaintiff's original Complaint, as stated above, it is not at all clear that it applies to his Amended Complaint. For similar reasons, it is not clear that collateral estoppel and/or res judicata bar the claims raised in his Amended Complaint. The Court need not decide the applicability of any of these doctrines as it is satisfied that Plaintiff's claims must be denied on the merits.

13

B. <u>Violation of Plaintiff's Federal Rights</u>

As Defendant correctly points out, Plaintiff has failed to substantiate any of his amended claims against Defendant Housing Authority with any admissible evidence.

1.    <u>Liability Under 42 U.S.C. § 1981</u>

Plaintiff first asserts liability against defendants under 42 U.S.C. § 1981, which provides as follows:

> 1981.  Equal rights under the law
>
> (a)    Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

A claim under section 1981 is restricted by its language to discrimination based on race or color. *Springer v. Seaman*, 821 F.2d 871 (1st Cir. 1987) (racial animus is necessary element of claim under § 1981). Accordingly, to state a claim under 42 U.S.C.

14

§ 1981, a plaintiff is required to plead facts demonstrating that the plaintiff is member of a racial minority, that there was intent to discriminate on the basis of race by the defendant, and that discrimination concerned one or more of the activities enumerated in the statute. *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *Imagineering, Inc. v. Kiewit Pac. Correctional Officer*, 976 F.2d 1303, 1313 (9th Cir. 1992) (under section 1981, plaintiff must allege facts that would support an inference that defendant intentionally and purposefully discriminated against him); *Hood v. New Jersey Dep't of Civil Service*, 680 F.2d 955, 959 (3d Cir. 1982).

Although Plaintiff does plead facts that he belongs to a racial minority, he fails to allege any facts whatsoever that would substantiate his broad allegations of racial discrimination; he has only alleged a conclusion without presenting any facts to support it. He has not demonstrated the manner in which his treatment has differed from the treatment that has been afforded to non-minority tenants, nor has he identified any facts that show that any Defendant purposefully discriminated against him based on his race. As a result, Defendants are entitled to summary judgment as to Plaintiff's claim for liability under 42 U.S.C. § 1981. *See Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63 (6th Cir. 1985) (section 1981 claim failed as a matter of law where the plaintiff failed to proffer a prima facie case of intentional race discrimination); *White v. Florida Highway Patrol, Div. of Florida Dep't of Highway Safety & Motor Vehicles*, 928 F. Supp. 1153 (M.D. Fla. 1996) (complaint dismissed due to vague and conclusory allegations).[13]

---

13    *See also Brady v. Cheltenham Township*, 1998 WL 164994, at *4 (E.D. Pa. Apr. 9, 1998) (plaintiffs' failure to support conclusory allegations of racial animus with facts that created a rational inference of purposeful discrimination resulted in denial of racial discrimination claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1985).

2.    42 U.S.C. § 1983

Next, Plaintiff asserts liability under 42 U.S.C. § 1983.  In order to state a claim

under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements: 1) the alleged

misconduct was committed by a person acting under color of state law; and 2) the

defendants' conduct deprived the plaintiff of rights, privileges, or immunities secured by

the Constitution or laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535

(1981), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 330-331

(1986).

Plaintiff has named the Allegheny County Housing Authority as the Defendant in

this action.  The Housing Authority is part of Allegheny County; it has no separate

existence.  Thus, Plaintiff's claim is construed as asserting liability against Allegheny

County.

Local governing bodies are deemed to be "persons" within the meaning of section

1983 and can be sued directly under the act for monetary, declaratory, or injunctive

relief.  *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  To establish

municipal liability, a plaintiff must: 1) demonstrate the existence of an unlawful policy

or custom, and 2) prove that the municipal practice was the proximate cause of his injury.

*Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir. 1990).  A municipality is liable "where

the municipality itself causes the constitutional violation at issue."  *Canton v. Harris*, 489

U.S. 378, 385 (1989).  To establish causation plaintiff must allege a "plausible nexus" or

"affirmative link" between the violation and the municipality's custom or practice.  *Id.*, at

850.  A municipality is not liable for the alleged misconduct of its employees absent a

link or nexus between the custom or policy and the employee's misconduct because such

liability would be predicated upon the doctrine of *respondeat superior*. *Monell*, 436 U.S. at 691.

Thus, a governmental unit may be liable under section 1983 only when its "policy" or "custom," whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, directly inflicted the injury. *Monell*, 436 U.S. at 694. The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible, *i.e.*, acts that the municipality has officially sanctioned or ordered. *Id.* In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), the Court further clarified that "municipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483 (citation omitted).

Moreover, mere identification of a policy or custom is not enough to establish municipal liability; a plaintiff also must establish causation. In this regard, a plaintiff carries the burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation at issue. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997) (a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights).

As set forth above, the County cannot be liable for any constitutional deprivations suffered by Plaintiff unless "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385. The

Supreme Court has instructed that "policy" is made when a decisionmaker possessing

final authority over the subject matter issues an official proclamation, policy, or edict.

*Pembaur*, 475 U.S. at 481.  Custom can be proven by showing that a given course of

conduct, although not specifically endorsed or authorized by law, is so well-settled and

permanent as virtually to constitute law.  *Monell*, 436 U.S. at 690.  *See also Bielevicz v.*

*Dubinon,* 915 F.2d 845, 850 (3d Cir. 1990).

In the case at bar, Plaintiff has not identified any policy or custom attributable to

the County.  In this regard, Plaintiff has not set forth any evidence of any similar

incidents that have occurred in the past, save for the one in which he was involved, to

prove some pattern of conduct that could establish a custom or policy.  It is well settled

that a single incident of unconstitutional behavior, without any direct involvement by a

municipal policy maker, is not sufficient to impose municipal liability.  *Pembaur v. City*

*of Cincinnati*, 475 U.S. 469, 479 (1986); *City of Oklahoma v. Tuttle*, 471 U.S. 808, 822

(1985); *Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995) (plaintiff's

mere assertion of the incident at issue, plus vague assertions about the police

department's failure to investigate other wrongdoings, did not provide sufficient proof of

a policy or custom to satisfy the dictates of section 1983).[14]   Thus, Plaintiff has failed to

prove an essential element of his case under 42 U.S.C. § 1983.

Nor has Plaintiff established liability against Allegheny County on the basis of its

failure to properly train or supervise its Housing Authority employees in implementing

the Section 8 voucher program.  In this regard, to establish liability on a failure to train

---

14      *See also Bryan County*, 520 U.S. at 409 (a single decision by municipal
lawmakers can trigger municipal liability only if the decision itself is found to be
unconstitutional, *i.e.*, a reasonable policymaker should have concluded that the "plainly
obvious" consequence of his or her decision would be the deprivation of a third party's
federally protected rights).

theory, Plaintiff must set forth specific allegations that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference. *Brown v. Muhlenberg Township,* 269 F.3d 205, 216 (3d Cir. 2001) (citing *City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197, 103 L.Ed.2d 412).

This is unlike the situation presented in *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996), *cert. denied*, 117 S. Ct. 1086 (1997). In that case, the plaintiff claimed that the city maintained a custom or policy of tolerating the use of excessive force by its officers. As proof of the city's acquiescence in such policy, the plaintiff in *Beck* presented evidence of a series of actual, written civilian complaints of similar nature containing specific information pertaining to the use of excessive force and verbal abuse by the same officer. All but one of the complaints had been transmitted through the police department chain of command to the Chief of Police. In addition, the plaintiff presented annual department reports detailing the high rate of excessive force incidents. After reviewing this evidence, the Court of Appeals for the Third Circuit concluded that, because the complaints came in a narrow period of time and were of a similar nature, a reasonable jury could have inferred that the Chief of Police of Pittsburgh and his department knew, or should have known, of the officer's violent behavior in arresting citizens. In addition, the Court noted that, although department reports highlighted concerns of excessive force, the City took no action in response to such concerns. Based on this record, the court determined that Beck had presented sufficient evidence from which a reasonable jury could have inferred that responsible policymakers for the City of Pittsburgh knew about, and acquiesced in, the tacit use of excessive force by its police officers. *Id.* at 976.

In the case at bar, however, Plaintiff has presented no evidence to demonstrate that his alleged injuries resulted from the County's "deliberate indifference" as demonstrated by its failure to train, supervise or discipline its Housing Authority employees. Specifically, he has not identified any specific training, supervision or disciplinary actions that were deficient.[15] Moreover, unlike the plaintiff in *Beck*, he fails to make any specific factual allegations that Allegheny County is liable based on a policy or custom of tolerating disparate treatment for African American tenants in Section 8 housing. Finally, he fails to allege that any similar conduct has occurred in the past such that Allegheny County should have been aware that an unreasonable risk of harm existed. *See Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) ("the record before us is critically deficient of evidence on which a jury reasonably could have based its conclusion that [the municipality] was deliberately indifferent to the need to train . . . and that this failure to train was the actual cause of the plaintiffs' injuries.").

As Plaintiff has failed to prove the essential elements of his 1983 claims against the Housing Authority, construed as claims against Allegheny County, Defendants are entitled to summary judgment as to those claims.

3.    Liability under 42 U.S.C. § 1985

Plaintiff further cites 42 U.S.C. § 1985 as a basis for his action. Section 1985(3) establishes a cause of action against any person who enters into a private conspiracy for the purpose of depriving an individual of the equal protection of the laws. *Rogin v. Bensalem Township.*, 616 F.2d 680, 696 (3d Cir. 1980), *cert. denied*, 450 U.S. 1029 (1981). The provisions of the statute encompass private conspiracies as well as actions

---

15 *See DiJoseph v. City of Philadelphia,* 156 F.3d 1225 (3d Cir. 1998) (affirming district court's dismissal of 1983 claims against the city for plaintiff's failure to demonstrate any inadequacy in the police training program).

under color of state law. *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971). In order to state a claim under Section 1985, the plaintiff must allege and prove four elements: 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; 3) an act in furtherance of the conspiracy; and 4) injury to a person or property or deprivation of any right or privilege of a citizen of the United States. *United Brotherhood of Carpenters & Joiners Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983) (citing *Griffin* 403 U.S. at 102)).

To state a claim of conspiracy, a plaintiff must set forth specific factual allegations that demonstrate collusion or concerted action among the alleged co-conspirators. *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir. 1993) (quoting *Adickes v. S.H. Kress & Correctional Officer.*, 398 U.S. 144, 150 (1970)); *Young v. Kann*, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991), *later proceeding, Young v. Quinlan*, 960 F.2d 351 (3d Cir. 1992). Specifically, the allegations must address "the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspiracy taken to achieve that purpose. . . ." *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (quotation omitted). Even though the Supreme Court held in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993), that the allegations in a section 1983 complaint cannot be held to a standard of heightened specificity, a plaintiff must allege conspiracy with some particularity. *Bieros v. Nicola*, 860 F. Supp. 223, 225 (E.D. Pa. 1994) (citing *Leatherman*, 507 U.S. at 168). "While the pleading standard under [Fed.R.C.P.] Rule 8 is a liberal one, mere incantation of the words 'conspiracy' or 'acted in concert' does not talismanically satisfy the Rule's

requirements." *Loftus v. Southeastern Pennsylvania Transportation Authority*, 843 F. Supp. 981, 987 (E.D. Pa. 1994).

Plaintiff has failed to allege any facts that indicate that any of the Defendants entered into any agreement or plan to deprive him of his constitutional rights. "[M]ere conclusory allegations of deprivations of constitutional rights are insufficient to state a § 1985(3) claim." *D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1376 (3d Cir. 1992) (quotation omitted), *cert. denied*, 506 U.S. 1079 (1993); *Stephens v. Kerrigan*, 122 F.3d 171, 184 (3d Cir. 1997) (plaintiffs failed to provide sufficient proof of conspiracy for claim under 42 U.S.C. § 1985(3)); *United States ex rel. Simmons v. Zibilich*, 542 F.2d 259 (5th Cir. 1976) (dismissal of cause of action for damages arising out of alleged conspiracy to interfere with civil rights was proper where convict's conclusory pleadings failed to allege any facts on which to base a conspiracy charge).[16] Consequently, Defendants are entitled to summary judgment as to Plaintiff's claims under 42 U.S.C. § 1985

4.    Liability under 42 U.S.C. § 1986

Plaintiff also asserts liability under 42 U.S.C. § 1986, which provides as follows:

> 1986. Action for neglect to prevent
>
> Every person who, having knowledge that any of the wrongs conspired to be don e, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his

---

16 Moreover, section 1985(3) provides a civil cause of action only when some other defined federal right has been violated; it creates no substantive rights. See *Great American Federal Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Because none of Plaintiff's remaining claims in this case can withstand the motion for summary judgment, there is no basis on which he can pursue a Section 1985(3) claim.

legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding five thousand dollars damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

42 U.S.C. § 1986.

Section 1986 specifically provides a one-year limitations period for filing actions thereunder. Pursuant to this limitations period, Plaintiff cannot impose liability against Defendant under 42 U.S.C. § 1986 based on events that occurred prior to April 7, 2003, one year prior to the filing of the instant lawsuit. Plaintiff's allegations against the Housing Authority concern events that occurred prior to April 22, 2002. Thus, he is barred from asserting liability under 42 U.S.C. § 1986.[17]

5.    Liability under 42 U.S.C. § 1988

Plaintiff also includes 42 U.S.C. § 1988, commonly referred to as the Civil Rights Attorney's Fees Awards Act of 1976, as a basis of recovery in his Amended Complaint. That statute provides that a prevailing party in a civil rights action may be awarded

---

17    Further, liability under 42 U.S.C. § 1986 is predicated on knowledge of a violation of 42 U.S.C. § 1985. *Bell v. City of Milwaukee*, 746 F.2d 1250, 1256 (7th Cir. 1984). As stated above, Plaintiff has not alleged any facts to support liability under 42 U.S.C. § 1985. Consequently, he has not demonstrated any basis for liability under 42 U.S.C. § 1986. *Cf. Rouse v. Benson*, 193 F.3d 936, 943 (8th Cir. 1999) (holding that plaintiff's allegations did not support liability under 42 U.S.C. §§ 1985(3) or 1986 as he failed to demonstrate a meeting of the minds of the alleged conspirators).

reasonable attorneys fees as part of its costs. *See North Carolina Dept. of Transp. v. Crest Street Community Council, Inc.,* 479 U.S. 6, 12 ( 1986) (Section 1988 does not authorize a court to award attorney's fees except in an action to enforce the civil rights laws). As Plaintiff has not demonstrated that he is a prevailing party in a civil rights action, he cannot prevail under 42 U.S.C. § 1988.

6.    42 U.S.C. § 2000d

Next, Plaintiff brings racial discrimination claims under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, which provides as follows:

> § 2000d. Prohibition against exclusion from participation in, denial of benefits of, and discrimination under Federally assisted programs on ground of race, color, or national origin.
>
>> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

A claim of intentional discrimination under Title VI is analyzed using the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and clarified in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Specifically, the plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination by showing that others not in the protected class were treated more favorably. After the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the defendant to dispel this presumption of discrimination, and articulate a legitimate, nondiscriminatory reason for the adverse action. After satisfying this burden, the burden shifts back to the plaintiff to show, by a preponderance of the

evidence, that the alleged reasons proffered by the defendant are pre-textual and that the defendant intentionally discriminated against the plaintiff.

Here, Plaintiff has not met his burden of proving a *prima facie* case of intentional discrimination. Specifically, he has not submitted any evidence that non-African Americans were treated differently than he with regard to his Section 8 voucher and his eviction. Even if the Court concluded that Plaintiff had made a *prima facie* case, he has not brought forth any evidence to demonstrate that the Housing Authority's actions in terminating his voucher were pre-textual. As noted in the state proceeding, Plaintiff was evicted for non-payment of rent, a condition specifically required by his Section 8 HAP contract. Drawing all inferences in favor of Plaintiff, there simply is no evidence from which a jury could find that Defendant purposefully discriminated against him based on race or disability. Consequently, Defendants are entitled to summary judgment as to Plaintiff's claims under Title VI.

7.    Fair Housing Act

Plaintiff also contends that his tenancy was terminated in violation of the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, Title VIII of the Civil Rights Act of 1968 ("FHA"). Under 42 U.S.C. § 3604(b), it is unlawful:

> [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

Pondexter argues that the Housing Authority discriminated against him by wrongfully terminating his Section 8 Voucher. (Docket No. 49, at 11). The burden shifting analysis described above applies to claims under the FHA. For the same reasons set forth above, Plaintiff has not met his burden of setting forth evidence of a *prima facie* case of purposeful discrimination. In other words, evaluating the evidence adduced in

the light most favorable to Plaintiff, the record can not support a presumption of intent to discriminate. Moreover, even if this Court were to conclude that Plaintiff had established a *prima facie* case, Defendant had a legitimate business reason for termination of Plaintiff's Voucher, *i.e.*, non-payment of rent. Plaintiff has not submitted any evidence that the termination of Plaintiff's Voucher was for any other reason.

In this regard, the Voucher and Family Obligations provide that a Voucher may terminate for any serious violation of the lease, including failure to pay rent. (Docket No. 76, Ex. 3; Docket No. 96, Ex. 10). In this case, Pondexter has failed to show that the Housing Authority improperly administered the HAP Contract, insofar as the HAP Contract, and therefore the Voucher, terminated at the end of Pondexter's lease with Green Meadows, per the terms of the HAP Contract. In addition, Pondexter has failed to show that the Housing Authority was somehow obligated to continue to provide Pondexter assistance at the termination of his lease. A Section 8 Voucher is not valid until a tenant enters into a HAP Contract. Pondexter's Voucher terminated as he did not have a HAP Contract for an approved housing unit and he failed to show up for an appointment to secure recertification. It follows that, under the terms of the HAP Contract, the Housing Authority was within its right to stop housing assistance payments after its last payment on April 1, 2002 because Pondexter did not submit a request for new housing unit. Furthermore, as required under the terms of the Voucher, even if Pondexter's lease had not terminated through Pondexter's failure to renew the contract on April 30, 2002, the Housing Authority co uld have terminated the Voucher after Pondexter's eviction. Under 24 C.F.R. § 982.552(b), the Housing Authority can terminate a Section 8 Voucher or refuse assistance for failure to comply with any of the family obligations, as defined by 24 C.F.R. § 982.552. ("The [Housing Authority] must

.

terminate program assistance for a family evicted from housing assisted under the program for serious violation of the lease.") These terms are also set forth in the HAP Contract: "The [Housing Authority] may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements" (Docket No. 96, Ex. 11, ¶ 10), as well the Voucher. (Docket No. 96, Ex. 10, at ¶ D, 2).

While Pondexter argues that the Housing Authority discriminated against him in wrongfully terminating his Section 8 Voucher, the evidence of record shows that the Voucher was not, in fact, wrongfully terminated.    Rather, based upon the evidence offered by both parties, in particular the Voucher and HAP Contract, the Housing Authority's continued housing assistance payments until April 1, 2002, were in accordance with the HAP Contract between the Housing Authority and Green Meadows and the agreement between Pondexter and the Housing Authority. In fact, the Housing Authority continued to make payments until the natural expiration of the Voucher. Pondexter failed to comply with his obligations under the lease and was evicted. While Pondexter is correct, he could have moved and continued receiving assistance, it was his obligation to renew his Voucher in order for said assistance to continue. The Housing Authority did not have any obligation to continue the voucher. Therefore, the Housing Authority acted pursuant to the clear and unambiguous terms of the HAP Contract and, in turn, Pondexter's Voucher, by which Pondexter is bound.

Furthermore, there is nothing in the evidence of record to suggest that, had Pondexter resubmitted an application for suitable housing to the Housing Authority, such assistance would not have resumed.  As such, there is no evidence and no genuine issue of fact as to whether the Housing Authority discriminated against him due to his race or

disability when it properly terminated Pondexter's Section 8 Voucher.   Therefore, Defendants are entitled to summary judgment as to Plaintiff's FHA claims.

## VI.   **CONCLUSION**

In summary, Pondexter has offered no relevant evidence of the Housing Authority's alleged discriminatory activity; nor has he offered evidence to show that there is any question that, in terminating Pondexter's Voucher, the Housing Authority acted pursuant to anything other than the terms of the agreement between Pondexter and the Housing Authority.  Pondexter has attempted to point out "issues" that he finds in the record, by specifically pointing to provisions in the HAP Contract and the enforcement thereof, with which he disagrees or finds unjust.[18]  However, mere allegations that a provision in the HAP Contract or Voucher are "at issue" are not enough to show that there is a genuine triable issue relative to these provisions.  Rule 56(c), Local Rule 56.1 and this Court's Practices and Procedures require more than just a claim that something is "at issue."

The Housing Authority has pointed to specific evidence in the record to show that there is no genuine issue of material fact as to the legality of its actions pertaining to Pondexter's eviction. Specifically, the Housing Authority has supplied sufficient evidence, in the form of the HAP Contract, the Section 8 Voucher, and the judgments against Pondexter from the various state court proceedings, to show that Pondexter's eviction was lawful and the termination of the Voucher was pursuant to the terms agreed to by Pondexter and the Housing Authority.  Pondexter has not submitted any evidence to show that the Housing Authority's actions were in any way discriminatory or illegal.

---

18    Plaintiff does this only by offering copies of the HAP Contract and Voucher and noting, on these copies, provisions that he finds to be at issue.

Consequently, the Housing Authority is entitled to summary judgment as to all claims raised in Plaintiff's Amended Complaint.

Therefore, based on the foregoing, the Housing Authority's Motion for Summary Judgment [DE 76] is granted and Pondexter's Motion for Summary Judgment, for Judgment as a Matter of Law, and for Judgment on the Partial Pleadings [DE 71] is denied.

An appropriate order follows.

Nora Barry Fischer
United States District Judge

cc:  all parties of record

Date:   October 23, 2007